IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-10842
_____

STASAN INC

Plaintiff - Appellant/Cross - Appellee

v.

MICHAEL P LOGAL, DEBORAH V LOGAL, and NETWORK STAFFING SERVICES

Defendants - Appellees/Cross - Appellants

_____

Appeal from the United States District Court for the
Northern District of Texas
(99-CV-2796)
_____

September 18, 2002

Before KING, Chief Judge, and PARKER and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Before the court are cross appeals from Plaintiff Stasan, Inc. ("Stasan") and Defendants Michael P. Logal ("M. Logal"), Deborah V. Logal ("D. Logal") (collectively the "Logals"), and Network Staffing Services, Inc. ("NSSI"), in which Stasan appeals the district court's declaration that the Logal-controlled NSSI board of directors is validly elected and the district court's denial of

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

Stasan's request for mandamus relief in connection with Stasan's contention that it was denied access to corporate records. NSSI and the Logals appeal the district court's summary judgment concluding that the NSSI stock issued to Stasan was validly issued. Upon review, we affirm the district court's judgment in all respects.

## FACTUAL PREDICATE

At its core, this case involves a dispute over stock in, and control of, NSSI, a Dallas-based Texas corporation formed in 1994 to provide temporary, contract, and executive personnel to a wide range of businesses. From its beginning, NSSI's corporate existence has been marked by interested parties dueling for control. The current litigation was engendered by the formation of a corporate alliance largely controlled by Stasan, Stasan's president Estelle Blumberg ("E. Blumberg"), and Stasan's business manager, Richard Blumberg ("R. Blumberg"). The group took control of the NSSI board, and, shortly thereafter, obtained a temporary restraining order to bar the Logals from entering the NSSI premises.[1] In response, M. Logal, who had been NSSI's president

---

[1] Prior to the instant case, the Logals brought suit against Stasan, the Blumbergs, and others asserting, among other claims, securities fraud and breaches of fiduciary duties. Like the Stasan-controlled group, they also sought and obtained a temporary restraining order enjoining the Stasan-controlled alliance from terminating the Logals's employment with NSSI and from attempting to gain control of NSSI bank accounts. The order was short-lived and the case was eventually dismissed without prejudice.

and the individual largely responsible for the day-to-day operations of the company before the Stasan takeover, joined D. Logal to form a shareholder group largely under their control. The Logal-controlled group signed a "Written Consent" to remove the Stasan-controlled board and reconstitute it as a Logal-controlled board. Litigation ensued.

In December 1999, NSSI and the Logals filed this suit seeking a declaration that 300 shares of NSSI stock issued to Stasan in 1994 are void for lack of consideration. Twenty days later, Stasan filed suit in Florida seeking declaratory relief that the stock was validly issued. The Florida action was abated in favor of this action. Stasan counter-claimed for a declaration that the Logal-controlled board was not validly elected and for mandamus relief from NSSI's alleged denial of access to its books and records.

The district court initially dismissed the action by NSSI and the Logals as barred by the applicable statute of limitations, but later realigned the parties and allowed the suit to continue. It thereafter granted summary judgment in favor of NSSI and the Logals, holding that the Logal-controlled board was validly elected. The court also granted summary judgment in favor of Stasan on the stock issue, holding that the stock was validly issued. It later denied Stasan's motion to reconsider the summary judgment that the Logal-controlled board was validly elected. After a bench trial, the district court denied Stasan's requested mandamus relief, and this appeal followed.

**STANDARD OF REVIEW**

The court reviews the district court's summary judgment determinations under a <u>de novo</u> standard of review,[2] and can affirm on any ground raised below.[3] Summary judgment is proper if there is no genuine issue as to any material fact.[4]

The parties dispute the standard to be applied to the district court's grant of summary judgment holding that the Logal-controlled board was validly elected. Stasan's appellate arguments regarding whether the Logal-controlled board was validly elected were first raised in the district court by way of a motion to reconsider the summary judgment in favor of NSSI and the Logals. Apparently expecting to receive an extension of time in which to file its response, an expectation not fulfilled by the district court, Stasan did not file a response to the motion for summary judgment filed by NSSI and the Logals. The district court subsequently rendered summary judgment in favor of NSSI and the Logals, prompting Stasan to file a motion for reconsideration which raised previously unasserted arguments.[5] In a one-line denial, the

---

[2]     See <u>Morris v. Covan Worldwide Moving, Inc.</u>, 144 F.3d 377, 380 (5th Cir. 1998).

[3]     See <u>Holtzclaw v. DSC Communications Corp.</u>, 255 F.3d 254, 257-58 (5th Cir. 2001).

[4]     See FED. R. CIV. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

[5]     Stasan did not raise these arguments in its motions to dismiss, motion for summary judgment, or motion for extension of time in which to file a response to NSSI's and the Logals's

4

district court disposed of Stasan's motion, and it is this denial that Stasan appeals.

A district court's denial of a motion for reconsideration is generally reviewed for abuse of discretion,[6] under which the ruling must only be reasonable.[7] However, as asserted by Stasan, "[i]f the [district] [c]ourt considers the [new] materials [included in the motion to reconsider] but still grants summary judgment, the appellate court may review all materials de novo."[8] Two points are worth mentioning on this issue. First, nothing in the record leads this court to believe that the district court considered the new arguments raised in the motion for reconsideration.[9] A one-line denial by the district court combined with the district court's denial of Stasan's unopposed motion for an extension of time to file its response to the motion and Stasan's failure to have the

---

motion for summary judgment.

[6] See Lake Hill Motors, Inc. v. Jim Bennett Yacht Sales, Inc., 246 F.3d 752, 757 (5th Cir. 2001); Giles v. General Elec. Co., 245 F.3d 474, 494 (5th Cir. 2001); Ford Motor Credit Co. v. Bright, 34 F.3d 322, 324 (5th Cir. 1994).

[7] See Bright, 34 F.3d at 324.

[8] Id. "On the other hand, if the district court refuses to consider the materials, the reviewing court applies the [general] abuse of discretion standard." Id. (quoting Fields v. City of South Houston, Texas, 922 F.2d 1183, 1188 (5th Cir. 1991)).

[9] It is not entirely clear whether the conclusion reached in Bright is even applicable to the situation before the court. While Stasan raised new arguments in its motion for reconsideration, the materials included were nothing novel for the district court.

district court reconsider this discretionary ruling precluding an extension (which, incidentally, was made forty-seven days before the district court's summary disposition on the board of directors issue) belies Stasan's conclusory averment that the "district court in this case considered the materials submitted with STASAN's Motion for Reconsideration." Second, the <u>Xerox Corp. v. Genmoora Corp.</u> case cited by Stasan is inapposite.[10] There, the factual scenario affirmatively "reflect[ed] the existence of several issues of material fact" brought to light in the motion to reconsider. This prompted our court to find that "the trial judge knew positively at that time [of the filing of the motion to reconsider] that his earlier grant of summary judgment could no longer be justified" because the motion supplied the district court with new evidence so "overwhelming" that the trial judge "could not turn his back" on the showing.[11] In contrast, wholly absent from Stasan's motion for reconsideration is the deluge of "overwhelming" fact issues evidenced in <u>Xerox</u>. In these circumstances, the court will review the district court's denial of Stasan's motion for reconsideration for abuse of discretion.

The standard of review for a bench trial is well established. Findings of fact are reviewed for clear error and legal conclusions

---

[10]     888 F.2d 345, 356 (5th Cir. 1989).

[11]     <u>Id.</u>

are reviewed de novo.[12]

**ANALYSIS**

Stasan appeals from two rulings: (1) the district court's declaration that the Logal-controlled board was validly elected, and (2) the district court's refusal to grant Stasan mandamus relief. NSSI and the Logals appeal from the district court's grant of summary judgment that the 300 shares of NSSI stock issued to Stasan were validly issued. Each point is addressed in turn.

### A. Board of Directors

In early 1999, NSSI's board consisted of R. Blumberg, Ed Astin, Piotr Zapendowski ("Zapendowski"), and D. Logal. In July 1999, R. Blumberg called a shareholders's meeting. Over the objection of D. Logal at this meeting, the existing NSSI board proceeded to elect a new Stasan-controlled board consisting of R. Blumberg, E. Blumberg, Zapendowski, and Ilene Phillips. Apparently unhappy with NSSI's financial response to this new board,[13] Zapendowski approached M. Logal for assistance and, on August 11, 1999, gave him (through a written "Consent Form") a proxy to vote Zapendowski's 200 shares of NSSI stock on all NSSI stockholder

---

[12]    Gebreyesus v. F.C. Schaffer & Assocs., Inc., 204 F.3d 639, 642 (5th Cir. 2000).

[13]    On July 29 1999, several "[c]oncerned [e]mployees of NSSI" submitted a letter to NSSI shareholders urging them to "[e]lect a Board of Directors that truly cares about this company's future and the employees that have built it," and one which "will achieve the goals envisioned by Michael and Debby Logal."

7

matters, "including election of directors." However, on that same date, Zapendowski, D. Logal, Laura Smith, Emily Carlson, and Ed Astin — owners of sixty-four percent of the outstanding NSSI stock — signed a "Written Consent," which removed the Stasan-controlled board and named D. Logal, M. Logal, Bill Emery, and Kathleen Logal as directors.

The district court summarily dismissed Stasan's claim for a declaration that the Logal-controlled board was not validly elected, concluding that "the Stasan board was properly removed and replaced by the Written Consent."

Relying on arguments raised for the first time in its motion for reconsideration, Stasan avers that Zapendowski forfeited his legal authority to enter into the Written Consent that removed the Stasan-controlled board because his proxy belonged to M. Logal. As M. Logal only voted his shares, not Zapendowski's 200 shares, Stasan contends that a majority of shareholders did not place their imprimatur on the corporate action and it was thus without effect to remove the Stasan-controlled board.[14]

Significant for the purpose of this controversy is Zapendowski's ability to revoke the proxy at issue. Even <u>Steinberg</u>

---

[14]    Stasan alternatively contends that a question of fact exists as to whether the Stasan-controlled board was properly removed <u>for cause</u>. Because the court affirms on the ground that the Logal-controlled board acted within its rights under the NSSI bylaws, it is unnecessary to address the alternative contention regarding the implied common law right of the Logal-controlled board to remove the Stasan-controlled board for cause.

v. American Bantam Car Co.,[15] the case principally relied on by Stasan in support of its argument that Zapendowski no longer had the authority to vote his shares, left open the possibility that the appointment could be revoked by the shareholder who gave the authority in the first instance.[16]  M. Logal, the holder of the proxy, signed the Written Consent along with Zapendowski and understood that the proxy was not controlling as to this majority vote.  M. Logal could have voted Zapendowski's shares when he voted his own had the two not <u>mutually</u> agreed to vote their own shares as to the Written Consent.[17]  When freed from the view that Zapendowski was irrevocably disenfranchised by the proxy he gave, it is clear that the district court did not abuse its discretion when it held that the Written Consent was effective to change the board of directors by a majority of shareholders under section 3.10 of the NSSI bylaws.[18]  We also note that, in 1996, when NSSI merged with

---

[15]     76 F. Supp. 426, 439 (W.D. Pa. 1948), <u>appeal dismissed</u>, 173 F.2d 179 (3d Cir. 1949).

[16]     <u>Id.</u> ("Until this appointment was revoked by the shareholder who gave the authority, said individuals, jointly and severally, were the only persons who had authority to act for or vote the shares of stock owned by the respective shareholders.").

[17]     <u>See, e.g.</u>, <u>Coleman v. Mayes</u>, 347 S.W.2d 827, 829 (Tex. Civ. App.– Houston 1961, writ ref'd, n.r.e.) (contract revoked by mutual agreement).

[18]     Section 3.10 of the NSSI bylaws provides, in relevant part, that:

> Any action required or permitted by the [Texas Business Corporation] Act to be taken at any annual or special meeting of shareholders of the corporation may be taken

another company, a "Memorandum of Action" was drafted at the demand of R. Blumberg, who ordered that all NSSI shareholders sign the Memorandum before or at the same time as the other merger documents. This Memorandum, which was expressly incorporated as a part of the bylaws and the articles of incorporation for NSSI, provides further support for the proposition that a majority of shareholders can add new directors or replace existing or resigned directors.[19]

## B. Access to Books and Records

The right of shareholders to inspect a corporation's books and

---

without a meeting, without prior notice and without a vote, if the action is taken by the holders of outstanding stock of each voting group entitled to vote thereon having not less than the minimum number of votes with respect to each voting group that would be necessary to authorize or take such action at a meeting at which all voting groups and shares entitled to vote thereon where [sic] present and voted. In order to be effective, the action must be evidenced by one or more written consents describing the action taken, dated and signed by approving shareholders having the requisite number of votes of each voting group entitled to vote thereon, and delivered to the corporation by delivery to its principal office in this state, its principal place of business, the corporate secretary, or another office or agent of the corporation having custody of the book in which proceedings of meetings of shareholders are recorded.

[19]    See Memorandum at 1 ("a majority of the shareholders can add new Directors (up to the specified limit) or replace existing or resigned Directors."). The Memorandum further provides that the board intends the Memorandum to be made a part of the articles of incorporation and bylaws, and that to the extent there is a conflict between the Memorandum and the articles of incorporation and bylaws, "the Articles of Incorporation and By-Laws will be immediately changed to reflect" the Memorandum.

records is a right statutorily granted in Texas.[20]  However, the method of enforcement of the right of inspection is by mandamus, a matter of judicial discretion.[21]  Stasan sought a writ of mandamus permitting it to inspect and copy the books and records of NSSI. After a bench trial, the district court concluded that NSSI had not "refused" access to its books and records and thus denied Stasan's request for mandamus relief.[22]  Stasan appeals this denial, contending that the district court applied the incorrect standard and must be reversed.

Article 2.44 of the Texas Business Corporation Act provides that:

> C. Any person who shall have been a shareholder for at least six (6) months immediately preceding his demand . . . shall have the right to examine . . . its relevant books and records of account, minutes, and share transfer records, and to make extracts therefrom.
> D. Any corporation which shall refuse to allow any such shareholder or his agent, accountant or attorney, so to

---

[20]    See TEX. BUS. CORP. ACT, art. 2.44 (Vernon Supp. 2001).

[21]    See Moore v. Rock Creek Oil Corp., 59 S.W.2d 815, 817 (Tex. Comm'n App. 1933, judgm't adopted).

[22]    As stated by the district court:

> Because the court finds that NSSI did not refuse to allow Stasan to inspect or copy the business records it requested, NSSI is entitled to judgment on Stasan's claim pursuant to BCA Article 2.44(C)-(D).  For the same reason, the Court concludes that Stasan is not entitled to recover costs or expenses, including attorneys' fees, incurred in enforcing its rights under BCA Article 2.44(C)-(D).

Memorandum Order at 11.

11

examine and make extracts from its books and records of account, minutes, and share transfer records, for any proper purpose, shall be liable to such shareholder for all costs and expenses, including attorneys' fees, incurred in enforcing his rights under this Article in addition to any other damages or remedy afforded him by law . . . .[23]

We agree that in holding that Stasan has the burden of showing that NSSI "refuse[d]" to allow Stasan or its agent to examine and copy the requested documents, the district court may have overstated Stasan's burden under article 2.44.[24] While the language of the Act clearly states that the corporation shall not "refuse" access to corporate records or books, the limited number of Texas cases that address article 2.44 do impose a judicial overlay of reasonableness to the standard.[25] Under this "reasonableness" standard, Stasan contends that the district court should have granted its mandamus request.[26]

---

[23]    TEX. BUS. CORP. ACT art. 2.44 (Vernon Supp. 2001).

[24]    We say "may" because language exists in the district court's opinion from which one could gather that the court used a constructive refusal test, essentially questioning whether NSSI, through its unreasonable actions, constructively refused access to the documents.  While not a carbon-copy of the reasonableness overlay described in Johnson Ranch Royalty Co. v. Hickey, 31 S.W.2d 150, 152-53 (Tex. Civ. App.– Amarillo 1930, writ ref'd), this standard does resist strict adherence to "refusal" that is worrisome to Stasan.

[25]    See, e.g., Johnson Ranch, 31 S.W.2d at 152-53 (bond condition and residency requirement were unnecessarily onerous and unreasonable restrictions).

[26]    While several Texas cases discuss a corporation's ability to contest whether a shareholder has a "proper purpose"

12

At first glance, the record does not engender confidence that NSSI was overly cooperative in meeting the requirements of article 2.44 regarding its largest shareholder's request for access to corporate records and books. However, a review of the district court's factual findings under the clear error standard, as this court must do, renders suspect Stasan's assertion that NSSI imposed unreasonable conditions on Stasan as a matter of law. The record demonstrates that D. Logal first responded to Stasan's invocation of article 2.44 (sent to NSSI by letter dated October 7, 1999) within two weeks. At that time, she denied access to the corporate books, arguing that, because Stasan was not a proper shareholder of NSSI, it was not entitled to inspect NSSI records. Two letters (dated October 29 and November 5, 1999) were then sent by Stasan in which Stasan expressed its "shock" at the allegations regarding Stasan's stock validity. While not conceding the point, Logal ultimately consented to make the NSSI records and books available to Stasan for inspection. As the district court found, inspection arrangements beyond this point fell through in scheduling — "[t]hat

in requesting the right of inspection, see e.g., Uvalde Rock Asphalt, Co. v. Loughridge, 425 S.W.2d 818, 819 (Tex. 1968); Accounting Search Consultants, Inc. v. Christensen, 678 S.W.2d 593, 595 (Tex. App.—Houston [14th Dist.] 1984, no writ); Chavco Inv. Co. v. Pybus, 613 S.W.2d 806, (Tex. Civ. App.—Houston [14th Dist.] 1961, writ ref'd n.r.e.), no case found discusses proper corporate behavior in the face of a request for inspection from an entity whose stock ownership is questionable to the corporation. The court thus falls back on the notion oft repeated in Texas case law that judicial discretion controls the issuance of a mandate. See, e.g., Moore, 59 S.W.2d at 817.

13

the parties actively corresponded between October 7 and December 9, 1999 regarding the scheduling of R. Blumberg's trip to Dallas to inspect the records persuades the court that, rather than obstructing Stasan's efforts to obtain access to and/or copy the NSSI records, NSSI <u>substantially cooperated</u> in these efforts." (emphasis added). Indeed, the district court remarked at one point that because Stasan indicated the quote for production was "too much," "it appears that Stasan, upon leaning how costly its document copying request would be, may simply have opted not to pursue this request." The district court further found that R. Blumberg simply "never thereafter [after learning of the cost of copying and subsequent to D. Logal suggesting December 14 or 15 for the inspection rather than the December 8 or 9 date suggested by R. Blumberg] attempted to reschedule his trip to Dallas to inspect the records." In these circumstances, where the district court has clearly set out a factual record effectively demonstrating the reasonableness of NSSI toward Stasan regarding inspection of the NSSI records and books, little doubt remains that viewing the district court's findings of fact through the prism of the reasonableness standard urged by Stasan renders the district court's ultimate holding unassailable.

At some point beyond the December 10, 1999 filing date of the current lawsuit, NSSI's obligations under article 2.44 merged into its pre-trial discovery obligations under FED. R. CIV. P. 34(b), especially where, as here, both parties were working to schedule a

14

time for investigation of the records, and the corporation, not the shareholder seeking records, initially brought suit. To the extent Stasan seeks to utilize its motion to compel and evidence of what it describes as abusive discovery,[27] to further its claim for liability under article 2.44, we agree with the district court that this expands article 2.44 beyond its purpose.

## C. Validity of Stasan's Shares

NSSI and the Logals aver that because Stasan failed to pay any consideration for the 300 shares of NSSI stock issued to it by NSSI in 1994, the shares are void as a matter of law. The district court did not concur, holding instead that the "assertion that Stasan failed to pay consideration for its shares is frivolous." In doing so, the court principally relied on a series of representations by NSSI and the Logals. As recounted below, these representations affirmatively demonstrate NSSI's and the Logals's belief (at least until late 1999) that the stock issued to Stasan was validly issued.

On July 1, 1994, the NSSI board of directors resolved that

---

[27] Stasan complains that NSSI imposed unreasonable conditions on it by requiring representatives to travel to Texas to review documents in the summer in an un-airconditioned warehouse, and by forcing Stasan to locate the documents in over 200 banker boxes containing various business documents. The imposition of these conditions, which appear to fall within the context of discovery controlled by the federal rules in any event, are not so unreasonable as to trigger the issuance of a writ of mandamus as a matter of law. A writ under article 2.44 is not issued as a matter of right, but is instead the product of judicial discretion. See Moore, 59 S.W.2d at 817.

Stasan's 300 shares of stock were to be issued in exchange for Stasan's "contribution of cash, property and/or labor." The stock certificate, also issued by NSSI on July 1, 1994, further states that Stasan's shares were "fully paid and non-assessable." In May 1996, when Articles of Merger and a Plan of Merger were executed by NSSI, all of the NSSI shareholders executed a Shareholder Agreement, in which Stasan is listed as the largest of the seven NSSI shareholders (owning 300 of the 890 shares then outstanding). The Shareholder Agreement was signed by all the shareholders. Minutes of the NSSI board of directors meeting of February 9, 1998, in which both D. Logal and M. Logal attended, further reflect that the directors of NSSI confirmed that the shareholders of the corporation included E. Blumberg on behalf of Stasan. Finally, in the district court, NSSI, D. Logal and M. Logal alleged in their initial Complaint that Stasan had obtained thirty percent of the stock in NSSI in return for receivables financing provided by Stasan's owner R. Blumberg. As found by the district court, the record is filled with evidence demonstrating knowledge of the issuance of Stasan's stock by NSSI and the Logals, participation in the issuance of this stock by NSSI and the Logals, and, up until late 1999, an understanding by NSSI and the Logals that this stock was validly issued.

In the face of the overwhelming record, the district court declined to adopt the view urged by NSSI and the Logals that none of their actions prior to the pronouncement of their current

16

position matters to the question of due consideration. We likewise reject the notion that these corporate documents are meaningless to our determination whether the 1994 stock issuance to Stasan should be deemed without effect. The corporate documents regarding the value of the consideration received for the stock are key to the validity of the stock issuance here. In their briefing to this court and at oral argument, NSSI and the Logals consistently resist efforts to frame this issue under article 2.16 of the Texas Business Corporation Act, which provides that "[i]n the absence of fraud in the transaction, the judgment of the board of directors or the shareholders . . ., as the case may be, as to the value and sufficiency of consideration received for shares shall be conclusive."[28] Instead, they aver that this issue does not turn on the board of director's determination of the value of consideration, but instead on whether any consideration at all was paid for the stock. In doing so, NSSI and the Logals constrict the holding of the district court. The court found that "Stasan provided adequate consideration for the shares." If support exists for this finding, then the board's determination of the value of this consideration is conclusive.

Whether Stasan gave any consideration for the stock would be

---

[28] TEX. BUS. CORP. ACT art. 2.16(B) (Vernon Supp. 2001). The court notes that section 5.02 of the NSSI bylaws in effect in 1994 when Stasan's stock was issued tracks article 2.16 and states that "in the absence of fraud in the transaction, the judgment of the Board as to the value of consideration received shall be conclusive."

an easier inquiry had the parties set forth in a written agreement the specific consideration given for the 300 shares of stock. Nonetheless, we agree with the district court that no question remains as to whether some consideration was provided to NSSI by Stasan for the stock. As evidenced by the affidavit of R. Blumberg and the supporting correspondence between him and M. Logal (dated before the July 1, 1994 issuance), the overwhelming evidence demonstrates that, before its issuance, Stasan, through R. Blumberg, performed services related to providing receivable financing, allowed credit to be made available for NSSI, provided NSSI with rights to Meridien Specialty Personnel Services, a predecessor of NSSI, and counseled M. Logal on marketing and business issues related to NSSI.[29]  Plainly, the record provides ample support for the district court's finding that consideration was received. As held by the district court, the determination by the board regarding the sufficiency of the value of this consideration is "conclusive."

This is not to say that we disagree with NSSI's contention that stock issued without consideration is not validly issued. Indeed, we concur with the suggestion that an issuance of stock

---

[29]  It appears that the district court may have also relied on a loan of $49,950 from Stasan to NSSI as the basis for its finding of consideration. While R. Blumberg provided a service in setting up the loan, establishing bank accounts for NSSI, and helping to provide receivable financing for NSSI, under article 2.16 and the NSSI by-laws which track this article, the loan itself does not fulfill the requirement of consideration.

18

without valid consideration is void under Texas law.[30]  We further agree with the assertion that a corporation cannot, through its conduct, ratify the issuance of stock where no consideration was given for the shares.[31]  NSSI and the Logals were not barred from introducing evidence to dispute whether Stasan furnished any consideration for its NSSI stock.[32]  In this case, however, they have failed to persuade the district court.  Clear evidence of consideration exists.

To the extent the district court relied on McAlister v. Eclipse Oil Co.,[33] for the proposition that some form of corporate estoppel prevents a corporation from contesting stock validity (in this case, five years after its issuance) even if no consideration for stock is given, we cannot concur.  McAlister is not so elastic as to extend to situations where no consideration is provided, and we decline to rule that the mere passage of time will transform a

---

[30]    See Vermilion Parish Peat Co. v. Green Belt Peat Moss Co., 465 S.W.2d 950, 954 (Tex. Civ. App.—Dallas 1971, writ ref'd n.r.e.).

[31]    See Gulf States Abrasive Mfg., Inc. v. Oertel, 489 S.W.2d 184, 188 (Tex. Civ. App.—Houston [1st Dist.] 1972, writ ref'd n.r.e.); Vermilion Parish Peat Co., 465 S.W.2d at 954; United States Steel Indus., Inc. v. Manhart, 405 S.W.2d 231, 233 (Tex. Civ. App.—Waco 1966, writ ref'd n.r.e.).

[32]    Miller v. Kendall, 804 S.W.2d 933, 941 (Tex. App.-Houston [1st Dist.] 1995, no writ) ("We do not read Article 2.16, which refers to the directors' act in valuating consideration for stock, as a parol evidence rule that bars the admission of evidence that the corporation's record of that act is mistaken.").

[33]    98 S.W.2d 171, 175-76 (Tex. 1936).

19

void issuance into a valid one.[34]  A thread of equity runs through the language in McAlister, but, at bottom, the stockholder whose stock the corporation in McAlister was seeking to have declared void had clearly provided consideration for the stock through services and property.[35]  As in McAlister, the record before this court supports a finding that Stasan provided some consideration for the stock issued to it by NSSI.  NSSI's efforts to now contest the value of this consideration five years after the corporation issued a "fully paid and non-assessable" stock certificate, a determination that is virtually incontestable in the presence of board approval, are imperiled by article 2.16(B).[36]

## CONCLUSION

All issues raised by the appellant and cross-appellants are controlled by the Texas Business Corporation Act.  We AFFIRM the district court's judgment in all respects.

---

[34]    See, e.g., United Steel Ind. v. Manhart, 405 S.W.2d 231, 233 (Tex. Civ. App.—Waco 1966, writ ref'd n.r.e.) ("The judgment of the board of directors 'as to the value of consideration received for shares' is conclusive, but such does not authorize the board to issue shares contrary to the Constitution for services to be performed in the future . . . or property not received . . . .") (citation omitted).

[35]    Id. at 172, 175.

[36]    As the issue is not necessary to the court's conclusion in this case, the court restrains from embarking on an analysis of the niceties of federal and state judicial estoppel.

20